**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| MAGNET FORENSICS, LLC, | |
| *Plaintiff,* | Civil Action No. |
| v. | |
| MARIO DEL GAUDIO and PARADIGM SHIFT TECHNOLOGY, S.L., | |
| *Defendants.* | |

**<u>VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>**

Plaintiff Magnet Forensics, LLC ("Magnet Forensics" or "Plaintiff"), by and through its undersigned attorneys, brings this action against Defendants Mario Del Gaudio ("Del Gaudio") and Paradigm Shift Technology, S.L. ("Paradigm Shift") (collectively, "Defendants"). In support, Magnet Forensics alleges as follows:

**<u>INTRODUCTION</u>**

1.     Magnet Forensics is a leading developer of digital investigation solutions that enable law enforcement agencies, intelligence agencies, and government entities worldwide to lawfully access, recover, and analyze digital evidence critical to solving crimes and protecting public safety. It develops highly sensitive and proprietary capabilities that represent the product of years of substantial investment in research, development, and engineering expertise. The

confidentiality and proprietary nature of Magnet Forensics' capabilities is essential to its customers' ability to access critical evidence in criminal investigations, its competitive position, and the continued operability of Magnet's products.

2.    Defendant Mario Del Gaudio worked as an Exploit Engineer placed with Magnet Forensics from November 2023 through November 2024. As a condition of his placement, Del Gaudio executed a Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement (the "Agreement"), which imposed binding obligations of confidentiality, non-disclosure, intellectual property assignment, and return of company property—all of which expressly survive the termination of his placement. During his tenure, Del Gaudio was assigned to work on one of Magnet Forensics' most sensitive proprietary capabilities: a zero-day access capability internally designated as "MSG."

3.    After his placement with Magnet Forensics ended, Del Gaudio became affiliated with Defendant Paradigm Shift, an entity in the technology and cybersecurity industry in the business of monetizing access capabilities. On June 18, 2026, Paradigm Shift published a detailed technical blog post titled "Introducing usbliter8: An A12/A13 SecureROM Exploit" (the "Publication"), which disclosed extensive technical details regarding a proprietary access capability that is, in substance, the same capability Del Gaudio worked on at Magnet Forensics under the MSG designation.

4.     Magnet Forensics has identified direct and compelling evidence linking Del Gaudio to the Publication, including a preserved screenshot connecting his name and photograph to the @NotHdesk account associated with the Publication, and a confirmed link between that account and Del Gaudio's known personal email address.

5.     Despite receiving cease-and-desist demands from Magnet Forensics' counsel, including a final, follow-up email demand, Defendants have refused to remove the Publication, refused to cease their misappropriation of Magnet Forensics' trade secrets, and refused to provide the written assurances demanded. Paradigm Shift retained counsel at Baker & McKenzie in Barcelona, Spain, who acknowledged receipt of the demands but expressly disputed all claims and declined to take any remedial action. As of the date of this Complaint, the Publication remains publicly accessible and has been widely disseminated across the technology and cybersecurity industry. Within days of its initial publication, the substance of the Publication was reported or republished by numerous prominent media outlets, including but not limited to Mashable, The Hacker News, TechCrunch, SecurityWeek, Infosecurity Magazine, Security Affairs, TechRadar, TechRepublic, and Cyber Insider, among others. The Publication was also shared and discussed on social media platforms, including Reddit. The rapid and widespread dissemination

of the Publication has compounded the harm to Magnet Forensics by exposing its trade secrets to an ever-expanding audience.

6. Defendants' unauthorized disclosure and use of Magnet Forensics' confidential and trade secret information has caused irreparable harm and continuing damage to Magnet Forensics, and must be stopped immediately. Even if the Publication is removed, the damage Defendants have already inflicted cannot be undone.

**PARTIES**

7. Magnet Forensics, LLC is a Delaware limited liability company with its principal place of business located at 931 Monroe Dr. NE, Suite A102-340, Atlanta, Georgia 30308. Magnet Forensics, LLC is registered to conduct business in Georgia. Magnet Forensics, LLC is an affiliate of Magnet Forensics Inc. The Agreement at issue in this action was executed between Magnet Forensics Inc. "and its affiliates" (defined therein as the "Company") and Del Gaudio. The Agreement defines "Company" to include Magnet Forensics Inc. and its affiliates. Magnet Forensics, LLC, as an affiliate of Magnet Forensics Inc., is a direct beneficiary of and entitled to enforce the Agreement. Additionally, Section 14 of the Agreement provides that the rights and obligations thereunder are assignable by the Company and shall inure to the benefit of the Company's successors and assigns. To the extent

necessary, Magnet Forensics Inc. has assigned its rights under the Agreement to Magnet Forensics, LLC.

8.    Defendant Mario Del Gaudio is an individual who, upon information and belief resides in Turin, Italy.  Del Gaudio can be served with process at his residence address, Via Osasco 75, Torino, Piemonte 10141, Italy,  pursuant to Rule 4(f) of the Federal Rules of Civil Procedure and the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, to which both the United States and Italy are signatories.

9.    Defendant Paradigm Shift Technology is an entity based in Spain, whose legal form of organization appears to be Sociedad Limitada (S.L.) after reasonable inquiry. Paradigm Shift can be served pursuant to Rule 4(f) and Rule 4(h)(2) of the Federal Rules of Civil Procedure and the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, to which both the United States and Spain are signatories.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over Magnet Forensics' claims arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., pursuant to 28 U.S.C. § 1331, because those claims arise under federal law.

11.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Magnet Forensics' state law claims as those claims arise from the same case or

controversy and are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

12.    This Court has personal jurisdiction over Del Gaudio because Del Gaudio expressly consented to the exclusive personal jurisdiction of this Court under the terms of the Agreement. Ex. A. § 12. Del Gaudio waived all possible objections to personal jurisdiction and venue of this Court. *Id.*

13.    This Court has personal jurisdiction over Paradigm Shift on multiple independent bases. First, the Defend Trade Secrets Act authorizes nationwide service of process and the exercise of personal jurisdiction over any defendant consistent with the law of the state where the district court is located, and, where a state court of competent jurisdiction would lack personal jurisdiction, consistent with the due process protections of the United States Constitution. 18 U.S.C. § 1836(c). Second, Paradigm Shift is subject to specific personal jurisdiction in Georgia because it committed tortious acts—including misappropriation of trade secrets and tortious interference with contract—that were directed at and caused injury to Magnet Forensics in Georgia, where Magnet Forensics maintains its principal place of business. Paradigm Shift knew or should have known that its publication of Magnet Forensics' proprietary trade secret information would cause harm to a Georgia-based company. Paradigm Shift's conduct establishes the

minimum contacts necessary for specific personal jurisdiction under the Georgia Long Arm Statute, O.C.G.A. § 9-10-91, and satisfies due process.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including the harm to Magnet Forensics' business operations and competitive position in Georgia. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(3) because Paradigm Shift is subject to the personal jurisdiction of this Court. Additionally, the Agreement is governed by Georgia law and Del Gaudio expressly consented to the exclusive venue of a state or federal court located in Fulton County, Georgia. Ex. A, Section 12.

## FACTUAL BACKGROUND

### A.    *Magnet Forensics' Business and Background*

15.    Founded in 2010, Magnet Forensics is a developer of digital investigation solutions used to help law enforcement and government investigative agencies resolve critical investigations and ensure public safety. It has built its reputation in the technology industry through its cutting-edge research and development of proprietary tools and methodologies that enable its customers to uncover, preserve, and analyze digital evidence in a forensically sound and legally defensible manner.

16.    Magnet Forensics services its customers by acquiring and analyzing evidence from digital sources, including mobile devices, computers, and Internet of Things (IoT) devices[1]. Access and acquisition of device data is achieved through Magnet's forensic products, each with different capabilities that are used to assist public and private sector customers.

17.    Magnet Forensics' core capabilities include: (1) accessing and extracting data from computer devices, such as iOS and Android mobile phones, (2) efficiently recovering digital artifacts, (3) providing collaborative tools that allow end users to analyze large volumes of digital evidence, (4) share digital evidence with other members of the justice work-flow, and (5) assisting in electronic discovery in legal matters.

18.    Magnet Forensics serves a global customer base consisting of more than 6,000 public and private sector entities in over 100 countries. Its public sector customers include law enforcement agencies, intelligence agencies, and government entities that rely on Magnet Forensics' tools and capabilities to conduct sensitive investigative operations.

19.    Among Magnet Forensics' most sophisticated and proprietary capabilities is its research and development of "access capabilities."

---

[1] IoT refers to the collective network of connected devices and the technology that facilitates communication between devices and the cloud, as well as between the devices themselves.

20.    Access capabilities are specialized tools and technical methodologies developed to gain access to digital devices. These capabilities are known in the technology and cybersecurity industry as "zero-day vulnerabilities" or "0-day vulnerabilities."

21.    Access capabilities can either be entirely unknown to the device's manufacturer or known to the manufacturer but for which no fix or patch has yet been developed or released.

22.    Magnet Forensics' development of access capabilities requires deep technical expertise, years of research investment, and significant internally developed proprietary information. As such, Magnet Forensics' development methodologies, underlying techniques, and associated information for access capabilities constitute valuable trade secrets of the company.

**B.    *Magnet Forensics Protects Its Confidential and Trade Secret Information***

23.    Magnet Forensics takes extensive and reasonable steps to protect the secrecy of its confidential and trade secret information.

24.    Magnet Forensics uses technology-based protections, including password-protected and encrypted computer systems and electronic databases, and restricts disclosure of its confidential and trade secret information to individuals who have a legitimate business need to access such information on a need-to-know basis.

25. Magnet Forensics also requires individuals who have access to its confidential and trade secret information, including employees and those who otherwise perform services on its behalf, to execute restrictive covenant agreements. In those agreements, the individual acknowledges receiving Magnet Forensics' proprietary and trade secret information during the course of their service, agrees not to disclose such information both during and after the termination of their service with Magnet Forensics, and agrees that any tool, capability, technical information, know-how, or other intellectual property developed or acquired by the individual on behalf of Magnet Forensics is the property of Magnet Forensics, regardless of the form in which it is embodied.

26. Magnet Forensics also employs physical security measures and access controls at its facilities and limits access to its most sensitive research and development projects, including access capability development, to a small number of authorized personnel.

C. **_Magnet Forensics Inc. and Magnet Forensics, LLC_**

27. Magnet Forensics, LLC is an affiliate of Magnet Forensics Inc. The two entities operate as part of a unified corporate family, with Magnet Forensics, LLC serving as the Company's U.S. operating entity headquartered in Atlanta, Georgia. Magnet Forensics Inc. and Magnet Forensics, LLC are both majority owned and

controlled by Thoma Bravo, a U.S. private equity firm headquartered in Chicago, Illinois.

28. The Agreement at issue in this action was executed between "Magnet Forensics Inc. and its affiliates" (defined therein as the "Company") and Del Gaudio. The Agreement's definition of "Company" expressly encompasses Magnet Forensics Inc. and its affiliates, including Magnet Forensics, LLC.

29. Magnet Forensics, LLC holds and maintains the trade secret information at issue, including the A12/A13 SecureROM access capability, and has suffered direct harm from Defendants' misconduct. To the extent necessary, Magnet Forensics Inc. has assigned to Magnet Forensics, LLC all rights under the Agreement, as expressly permitted by Section 14 of the Agreement.

**D.    *Del Gaudio's Placement with Magnet Forensics***

30. Del Gaudio was placed with Magnet Forensics through a professional employer organization arrangement with Globalization Partners. His tenure with Magnet Forensics began on November 12, 2023, at which time he assumed his role as an Exploit Engineer.

31. Del Gaudio reported to Ankit Patel, the Director of iOS Research at Magnet Forensics.

32. During his tenure, Del Gaudio was embedded with Magnet Forensics' most sensitive technical operations and capabilities, and gained extensive and

sustained access to some of Magnet Forensics' most closely guarded proprietary information.

33.    Specifically, Del Gaudio participated in weekly team meetings at which the details of Magnet Forensics' access capability, internally designated as "MSG," as well as Magnet Forensics' access strategy were discussed in depth. These meetings addressed, among other things, the specialized tools needed to perform the research that led to the discovery of the MSG capability, the custom hardware required to communicate with the target device in order to trigger the vulnerability, and the access strategy needed to gain control of the device's system. Del Gaudio's regular participation in these meetings gave him repeated, direct exposure to the full scope of the MSG capability and Magnet Forensics' proprietary approach to leveraging the underlying vulnerability.

34.    As early as April 2024, Magnet Forensics engineers discussed the technical details of the A12/A13 SecureROM vulnerability in meetings in which Del Gaudio participated. In May 2024, the MSG capability was integrated into one of Magnet Forensics' products, a milestone that was discussed in the weekly standups Del Gaudio attended. Del Gaudio was therefore aware not only of the MSG capability's technical architecture but also of its integration into Magnet Forensics' commercial product line and its operational significance to Magnet Forensics' business.

35.     In addition, Del Gaudio was specifically tasked with designing a separate, unrelated tool for testing another capability. In order to test that tool, however, Del Gaudio was required to make use of the MSG capability. Del Gaudio executed the MSG capability likely dozens of times in the course of this work, giving him hands-on, intimate familiarity with the access and capabilities that the MSG capability provided.

36.     Del Gaudio's placement with Magnet Forensics expired by its terms on November 12, 2024. The expiration of his placement terminated his obligation to perform work on behalf of Magnet Forensics but did not extinguish—and could not extinguish—his post-placement obligations to Magnet Forensics, which continue in perpetuity.

### E.     *The Terms of Del Gaudio's Agreement*

37.     As a condition of his placement, Magnet Forensics required Del Gaudio to execute a Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement (the "Agreement") to protect the confidential information and trade secrets to which he would be granted access. A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

38.     The Agreement was executed by Del Gaudio on October 6, 2023, and countersigned by Angelo Loberto, Chief Operating Officer of Magnet Forensics, on October 5, 2023.

39.    Under the terms of the Agreement, Del Gaudio acknowledged that his placement with Magnet Forensics was one of "trust and responsibility with access to Confidential Information, trade secrets, and other information concerning employees and customers of the Company." Ex. A, Sec. 1.2.

40.    Del Gaudio received consideration in the form of his placement with Magnet Forensics, new and additional training, access to Magnet Forensics' customers, and access to Magnet Forensics' confidential and proprietary market knowledge, pricing information, and other Confidential Information, in exchange for his agreement to comply with the stated restrictive covenant provisions. *See generally*, Ex. A.

41.    Under the non-disclosure provision set forth in Section 5.1 of the Agreement, Del Gaudio agreed he would not:

> [D]irectly or indirectly: (i) misappropriate, disclose, transfer, assign, disseminate or otherwise communicate or make available (orally, in writing or otherwise) to any person or entity any Confidential Information, or any part thereof; or (ii) use or reproduce (in whatever form) any Confidential Information for his own benefit or purposes or for the benefit or purposes of any person or entity, except as may be reasonably necessary in the performance of the duties and responsibilities of Employee hereunder and in the best interests of the Company or as otherwise may be authorized expressly in writing by the Company.

42.    Confidential Information is defined in Section 5.1 of the Agreement to include, without limitation:

> [I]nformation containing or concerning business strategies, customers, prospective customers, pricing practices, contracts, marketing and all other information that belongs to or relates to the Company and its business that is essential to the protection of the goodwill of the Company and/or any of its Affiliates and to the maintenance of their competitive position in the industry and that, the disclosure or improper use of which would be highly detrimental to the Company and/or any of its Affiliates . . . Confidential Information shall also include any and all information about the Company that is not generally known or available to the public, but has been developed, acquired or compiled by the Company at great effort and expense.

43. Del Gaudio acknowledged and agreed that the non-disclosure obligations "shall survive the termination of Employee's placement with the Company for any reason whatsoever and shall remain in full force and effect so long as the Confidential Information remains confidential." Ex. A, Sec. 5.1.

44. Under Section 5.2, Del Gaudio further agreed that "any unpublished information is secret and confidential, has independent economic value and is the subject of reasonable efforts by the Company to prevent its disclosure," and agreed "to refrain from using to his advantage, or to the advantage of any other person, corporation, partnership, firm or entity, any Confidential Information gained from or in connection with his placement." Ex. A, Sec. 5.2.

45. Under Section 5.3, Del Gaudio expressly agreed that in the event he becomes aware of the unauthorized use of Confidential Information by any party, he would promptly notify an executive officer of Magnet Forensics. Upon information and belief, Del Gaudio failed to provide any such notice.

46.    As stated in Section 5.5, Del Gaudio was also provided with the following immunity notice language under the Defend Trade Secrets Act:

Pursuant to the Defend Trade Secrets Act of 2016, Employee acknowledges that he/she shall not have criminal or civil liability under any federal or state trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, if Employee files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Employee may disclose the trade secret to his attorney and may use the trade secret information in the court proceeding, if he (X) files any document containing the trade secret under seal and (Y) does not disclose the trade secret, except pursuant to court order.

47.    Further, under Section 3.1 of the Agreement, Del Gaudio acknowledged that he had not obtained and would not obtain any personal property rights in Magnet Forensics' property, including "Materials" defined to encompass:

[A]ny writing, communications, manuals, documents, instruments, contracts, agreements, files, literature, data, technical information, know-how, software, secrets, formulas, products, methods, procedures, processes, devices, apparatuses, trademarks, trade names, trade styles, service marks, logos, copyrights, patents, inventions, discoveries, whether or not patentable, which [Del Gaudio] may have previously conceived or made, or may conceive or make, either alone or in conjunction with others, and related to the business of the Company or its successors, Affiliates or related companies.

48.    Under Section 3.2, Del Gaudio agreed that "during his placement with the Company and any time afterwards all Materials shall be the sole and exclusive

property of the Company." He further agreed to "hold all Materials in trust and strict confidence for the Company and its clients, without disclosing such information to any third parties, whether contained in Employee's memory or embodied in writing or other physical form." Ex. A, Sec. 3.2.

49.     Under Section 3.3, Del Gaudio irrevocably assigned to Magnet Forensics all right, title, and interest in any Materials or intellectual property rights relating to Materials, worldwide.

50.     Under the intellectual property assignment provision contained in Section 4 of the Agreement, Del Gaudio agreed that all "Company Inventions"—defined to include inventions developed using the Company's equipment, supplies, facilities, or trade secrets, resulting from work performed for the Company, or relating to the Company's business or current or anticipated research and development—"will be the sole and exclusive property of the Company and are hereby irrevocably assigned by Employee to the Company from the moment of their creation and fixation in tangible media." Ex. A, Sec. 4.2.

51.     Del Gaudio further irrevocably transferred and assigned to Magnet Forensics "all worldwide patents, patent applications, copyrights, mask works, trade secrets and other intellectual property rights in any Company Invention" and waived all "Moral Rights." Ex. A, Sec. 4.4.

52.     "Moral Rights" is defined in Section 4.4 to include:

[A]ny rights to claim authorship of a Company Invention, to object to or prevent the modification of any Invention, or to withdraw from circulation or *control the publication or distribution of any Company Invention*, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is generally referred to as a "moral right." (emphasis added).

53.    Under Section 11 of the Agreement, Del Gaudio acknowledged and agreed that "the provisions of this Agreement shall survive any termination of [Del Gaudio's] placement with the Company."

54.    The Agreement is governed by the laws of the State of Georgia.  Ex. A, Sec. 12.

55.    Del Gaudio acknowledged under Section 10.2 "that a breach of any section of this Agreement will cause serious harm to the Company and/or any of its Affiliates; and that all of the covenants and restrictions contained herein are reasonable and valid and all defenses to the enforcement thereof are hereby expressly waived."

56.    Further, under Section 10.3, Del Gaudio agreed that "in addition to all other remedies and damages that may be available to the Company hereunder and at law or in equity, the Company shall be entitled to specific performance and any injunctive or other equitable relief as a remedy for any such breach."

57.    Additionally, under Section 13 of the Agreement, Del Gaudio acknowledged that the prevailing party in any dispute or litigation concerning the

Agreement "shall be entitled to its costs and expenses, including reasonable attorneys' fees and costs."

**F.**     ***The A12/A13 SecureROM Access Capability as a Trade Secret***

58.    Certain mobile devices manufactured by Apple, Inc. ("Apple") contained a zero-day vulnerability affecting the A12 and A13 computer chips in those devices (the "A12/A13 SecureROM vulnerability").

59.    Magnet Forensics developed a proprietary capability to target this vulnerability (the "A12/A13 SecureROM access capability"). The A12/A13 SecureROM access capability is a specialized tool and methodology designed to access digital devices through the A12/A13 SecureROM vulnerability, for which no publicly available or manufacturer-issued fix exists.

60.    The A12/A13 SecureROM access capability is integrated into and underlies critical functionality within Magnet Forensics' commercial products, including its mobile access tools. Defendants' unauthorized disclosure of the capability has alerted Apple to the vulnerability, which will cause Apple to seek to develop and deploy a mitigation or patch. If and when Apple mitigates the vulnerability, the data access capabilities within Magnet Forensics' products will be materially impaired or rendered inoperative, causing direct and potentially irreversible harm to the efficacy of these products.

61.    The A12/A13 SecureROM access capability is the product of extensive research, deep technical expertise, and significant investment by Magnet Forensics. Its development required specialized knowledge and resources not generally known or readily ascertainable by Magnet Forensics' competitors or the public.

62.    The A12/A13 SecureROM access capability provides Magnet Forensics with a substantial competitive advantage in the digital forensics market by enabling its customers—including law enforcement agencies, intelligence agencies, and other public and private sector entities—to access, recover, and preserve digital evidence from devices that would otherwise remain inaccessible.

63.    Magnet Forensics took reasonable steps to maintain the secrecy of the A12/A13 SecureROM access capability, including by: (a) limiting access to the capability and its underlying technical information on a need-to-know basis; (b) using password-protected and encrypted electronic databases to maintain restricted access; (c) restricting access to access capability-development projects to a small number of authorized personnel; (d) requiring individuals with access to execute restrictive covenant agreements containing intellectual property assignment, proprietary rights, and non-disclosure provisions, including the Agreement executed by Del Gaudio; and (e) employing physical and digital security measures at its facilities and on its systems.

64.    The A12/A13 SecureROM access capability, including its underlying methodology, architecture, implementation details, and operational deployment information, derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use. The confidentiality of the access capability is also essential to the integrity of sensitive investigative operations that depend on the capability remaining non-public.

65.    Neither the access capability nor the underlying research and development were known to the public prior to Defendants' unauthorized disclosure.

**G.    *Del Gaudio and Paradigm Shift Misappropriate Magnet Forensics' Trade Secrets***

66.    Paradigm Shift is in the technology and cybersecurity industry. Based in Spain and operating globally, Paradigm Shift describes itself as specializing in "uncovering and exploiting zero-day vulnerabilities across complex technologies" and "delivering cutting-edge research solutions."[2] Paradigm Shift thus operates in the precise niche in which Magnet Forensics developed the A12/A13 SecureROM access capability, and its core business model of monetizing access capabilities is

---

[2] Available at: https://ps.tc/pages/home.html (last visited July 6, 3:25pm.).

directly aligned with the type of proprietary capability that Del Gaudio misappropriated.

67.    Following the expiration of his placement with Magnet Forensics, Del Gaudio became affiliated with Paradigm Shift.

68.    On June 18, 2026, Paradigm Shift published a detailed technical blog post titled "Introducing usbliter8: An A12/A13 SecureROM Exploit" (the "Publication" or the "usbliter8 Exploit Blog Post").[3]

69.    The usbliter8 Exploit Blog Post contains extensive technical disclosures concerning an A12/A13 SecureROM access capability that Paradigm Shift publicly branded "usbliter8." That access capability makes use of the same proprietary vulnerability discovered by Magnet Forensics and developed into an access capability to which Del Gaudio had access during his placement with Magnet Forensics. The correlation between the technical details in the Publication and Magnet Forensics' proprietary capability is not coincidental.

---

[3] This Blog Post is not attached as an exhibit to this Complaint nor is the link to it provided because doing so would further publicly disseminate the very trade secret information that Magnet Forensics seeks to protect in this action. Magnet Forensics will promptly make the full text of the Blog Post available to the Court for in camera review upon request, or under such protective conditions as the Court deems appropriate, to avoid compounding the harm caused by Defendants' unauthorized disclosure.

70.    Magnet Forensics has a reasonable and well-founded basis to conclude that Del Gaudio is directly responsible for, or materially contributed to, this disclosure based on the following:

(a) Del Gaudio had direct access to and documented involvement in the development of the precise capability that is the subject of the Publication during his placement with Magnet Forensics;

(b) Following the expiration of his placement, Del Gaudio became affiliated with Paradigm Shift—the entity that published the capability;

(c) A preserved screenshot obtained by Magnet Forensics links Del Gaudio's name and photograph to the @NotHdesk account, which has been identified as an author, contributor, or individual directly associated with the Publication; and

(d) The @NotHdesk account identifier is directly connected to Del Gaudio's known personal email address, mario@athdesk.me, confirming the link between his identity and that account.

71.    Upon information and belief, Del Gaudio provided Paradigm Shift with Magnet Forensics' confidential and trade secret information regarding the A12/A13 SecureROM access capability and the zero-day vulnerability found in these Apple devices.

72. Magnet Forensics did not authorize Del Gaudio to disclose the A12/A13 SecureROM access capability or any information relating thereto to Paradigm Shift or any other person or entity.

73. Upon information and belief, Paradigm Shift used Magnet Forensics' trade secret information regarding the A12/A13 SecureROM access capability to create usbliter8 tool, which it disclosed to the public in the usbliter8 Exploit Blog Post.

74. Upon information and belief, Paradigm Shift coordinated disclosure with Apple Product Security prior to publishing the usbliter8 Exploit Blog Post. Paradigm Shift's coordination with Apple confirms that Paradigm Shift understood the sensitivity of the information it possessed and made a deliberate, fully informed decision to publish it regardless.

75. The media coverage has already begun to publicly associate Magnet Forensics with the disclosed access capability. For example, TechCrunch reported that "[g]enerally speaking, companies that sell systems to hack iPhones seized by authorities, such as Cellebrite and Magnet Forensics need, and likely already have at their disposal, techniques similar to usbliter8 to break into iPhones." This reporting illustrates the cascading harm caused by Defendants' unauthorized disclosure: not only has the access capability itself been exposed, but the public is now being invited to speculate about Magnet Forensics' proprietary capabilities,

further eroding the secrecy on which Magnet Forensics' business depends and damaging its relationships with customers who rely on the discretion and non-public nature of Magnet Forensics' tools.

**H.** *Magnet Forensics' Cease-and-Desist Demands and Defendants' Refusal to Comply*

76. On June 18, 2026, Magnet Forensics, through its counsel, sent Del Gaudio a cease-and-desist letter, demanding that he: (1) cease all further disclosure of Magnet Forensics' confidential and trade secret information and proprietary technology, (2) remove the usbliter8 Exploit Blog Post from all platforms on which it had been published or distributed, (3) preserve all evidence, (4) provide written disclosure identifying all persons and entities to whom he had disclosed Magnet Forensics' confidential information, (5) return or permanently destroy any Magnet Forensics property in his possession, and (6) certify in writing that he complied with Magnet Forensics' demands. A true and correct copy of the cease-and-desist letter to Del Gaudio is attached hereto as **Exhibit B**.

77. The following day, on June 19, 2026, Magnet Forensics, through its counsel, sent Paradigm Shift a cease-and-desist letter demanding that Paradigm Shift immediately: (1) cease all further disclosure of Magnet Forensics' confidential, proprietary, and trade secret information, (2) remove the usbliter8 Exploit Blog Post and all associated proof-of-concept code and technical details from all platforms on

which it was published or distributed, (3) preserve all evidence, (4) provide written disclosure identifying all persons who contributed to or had access to the technical information underlying the Publication, and (5) confirm its compliance in writing. A true and correct copy of the cease-and-desist letter to Paradigm Shift is attached hereto as **Exhibit C**.

78.    On June 22, 2026, counsel for Paradigm Shift at Baker & McKenzie in Barcelona, Spain, acknowledged receipt of Magnet Forensics' cease-and-desist letter but expressly disputed all claims and declined to take any remedial action. Paradigm Shift's counsel stated that it "reserve[d] all rights and [did] not admit any of the claims asserted or underlying facts alleged." A true and correct copy of this response letter is attached hereto as **Exhibit D**.

79.    On June 24, 2026, Del Gaudio sent an email to Magnet Forensics' counsel acknowledging receipt of the June 18, 2026 cease-and-desist letter and indicating that he was in the process of securing legal counsel. However, Del Gaudio did not comply with any of the demands set forth in the cease-and-desist letter, and the Publication remained publicly accessible.

80.    On June 26, 2026, Magnet Forensics, through its counsel, sent follow-up emails to both Del Gaudio and Paradigm Shift's counsel. In its email to Del Gaudio, Magnet Forensics noted that despite Del Gaudio's acknowledgment of the cease-and-desist demands, he had failed to take any steps to comply, and that every

day of continued publication was causing compounding and irreparable harm to Magnet Forensics. Magnet Forensics reiterated all demands in full—including immediate cessation of all further disclosure, removal of the Publication and all associated materials from all platforms, return of the Company device, certification of destruction of all confidential information, preservation of all evidence, and written identification of all persons or entities to whom Del Gaudio had disclosed Magnet Forensics' confidential information—and provided a forty-eight (48) hour deadline to comply, with notice that Magnet Forensics would proceed in federal court without further notice. A true and correct copy of this letter is attached hereto as **Exhibit E**.

81.    In its email to Paradigm Shift's counsel, Magnet Forensics rejected Paradigm Shift's request for an additional two weeks to respond to the cease-and-desist demands, noting that the Publication remained publicly accessible and that every day of continued publication compounded the irreparable harm to Magnet Forensics by further destroying the confidentiality upon which the A12/A13 SecureROM access capability's economic value depends. Magnet Forensics reiterated all demands in full—including immediate removal of the Publication and all associated proof-of-concept code and materials, cessation of all further disclosure, preservation of all evidence, written identification of all persons who contributed to or received the underlying technical information, and written

confirmation of compliance—and similarly provided a forty-eight (48) hour deadline to comply, with notice that Magnet Forensics would proceed in federal court without further notice. The letter further noted that Paradigm Shift's own coordination with Apple Product Security prior to publication confirmed that Paradigm Shift understood the sensitivity of the information and chose to release it anyway, and that Magnet Forensics would pursue the full range of enhanced remedies available for willful and malicious misappropriation. A true and correct copy of this letter is attached hereto as **Exhibit F**.

82.    On June 28, 2026, counsel for Paradigm Shift sent a second letter to Magnet Forensics' counsel, again declining to take any remedial action. Rather than removing the Publication or providing the assurances demanded, Paradigm Shift's counsel challenged Magnet Forensics to identify "the precise identification of the information your client contends constitutes trade secrets" and questioned whether Del Gaudio "had access to, or was involved in the development of, any specific information said to constitute Magnet Forensics' alleged trade secrets." Paradigm Shift's counsel also requested clarification on "the exact scope of the relief sought" and suggested "arranging a call early next week to discuss this matter further." The letter made no commitment to remove the Publication, to cease using Magnet Forensics' proprietary information, or to take any other remedial action. A true and correct copy of this letter is attached hereto as **Exhibit G**.

83.    On June 30, 2026, counsel for Magnet Forensics and counsel for Paradigm Shift participated in a call to discuss the matter. During that call, no resolution was reached. Paradigm Shift did not agree to remove the Publication, did not agree to cease using Magnet Forensics' proprietary information, and did not provide any of the assurances demanded in Magnet Forensics' cease-and-desist correspondence. Following the call, Paradigm Shift's counsel sent an email to Magnet Forensics' counsel in which counsel stated that Paradigm Shift was "continuing to review the relevant facts" and requested that Magnet Forensics provide its "specific demands," despite having already received two detailed cease-and-desist letters setting forth those demands with specificity. Paradigm Shift's counsel also asserted its "understanding" that "Magnet will refrain from initiating any legal proceedings" while Paradigm Shift "continues its factual review," a characterization that Magnet Forensics did not agree to and does not accept. At no point during the call or in the follow-up correspondence did Paradigm Shift commit to removing the Publication, returning or destroying Magnet Forensics' proprietary information, or taking any other remedial action.

84.    On July 1, 2026, Del Gaudio's counsel emailed Magnet Forensics' counsel, stating that they have been retained by Del Gaudio and  "are currently reviewing the matter and ask that all future communications be directed to [their] attention." A true and correct copy of this email is attached hereto as **Exhibit H**.

85.    As of the date of this Complaint, more than two weeks since Magnet Forensics first demanded that Defendants cease their unlawful conduct, the Publication remains publicly accessible, Defendants have taken no remedial action of any kind, and Magnet Forensics has exhausted all reasonable pre-litigation efforts to resolve this matter without judicial intervention. Indeed, as of the date of this Complaint, the usbliter8 Exploit Blog Post has been republished, reported on, or referenced by at least a dozen prominent technology and cybersecurity media outlets, including Mashable, The Hacker News, TechCrunch, SecurityWeek, Infosecurity Magazine, Security Affairs, TechRadar, TechRepublic, and Cyber Insider, among others. The Publication was also disseminated on social media platforms, including Reddit. Each successive republication has further expanded the audience, including Magnet Forensics' direct competitors, independent security researchers, and device manufacturers, with access to Magnet Forensics' trade secret information, compounding the irreparable harm to Magnet Forensics and underscoring the urgency of injunctive relief.

86.    Magnet Forensics' investigation into the full scope of Defendants' misappropriation and disclosure is ongoing. The evidence set forth in this Complaint does not represent the outer boundary of the evidence available to Magnet Forensics.

## COUNT I
### Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. 1836(B)(1), *et seq.*
### (Against All Defendants)

87.    Magnet Forensics restates and incorporates herein by reference all allegations set forth in the preceding paragraphs as if fully set forth herein.

88.    The A12/A13 SecureROM access capability, including its underlying methodology, architecture, technical implementation, and operational deployment information, constitutes a "trade secret" within the meaning of the DTSA, 18 U.S.C. § 1839(3), because it is information that: (a) the owner thereof has taken reasonable measures to keep secret; and (b) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

89.    Magnet Forensics took reasonable steps to maintain the secrecy of this trade secret information, including by limiting access to Magnet Forensics' trade secrets on a need-to-know basis, using password protected and encrypted electronic databases to maintain restricted access to such trade secret information, and having Del Gaudio execute the Agreement, which includes intellectual property assignment, proprietary rights, and non-disclosure provisions. Magnet Forensics derives a competitive advantage from maintaining the confidentiality of the A12/A13 SecureROM access capability, which has independent, actual or potential economic

value from not being generally known to or readily ascertainable by other persons who may obtain economic value from its disclosure or use.

90.     In particular, the A12/A13 SecureROM access capability is the product of extensive research, technical expertise, and significant investment by Magnet Forensics in identifying and developing a methodology to access devices through an unpatched security flaw, known as a "zero-day vulnerability," for which no publicly available or manufacturer-issued fix exists. The development of this capability required specialized knowledge and resources that are not generally known or readily ascertainable by Magnet Forensics' competitors or the public.

91.     The A12/A13 SecureROM access capability provides Magnet Forensics with a substantial competitive advantage in the digital forensics market by enabling its customers, including law enforcement agencies, intelligence agencies, and other public and private sector entities, to access, recover, and preserve digital evidence from devices that would otherwise remain inaccessible. Without this access capability, Magnet Forensics' customers would be unable to extract critical evidence from certain devices that contain the zero-day vulnerability that the access capability targets.

92.     Magnet Forensics is the owner of this trade secret, having developed and protected it as described above.

93. The A12/A13 SecureROM access capability relates to a product or service used in, or intended for use in, interstate and foreign commerce.

94. Defendants misappropriated Magnet Forensics' trade secret within the meaning of 18 U.S.C. § 1839(5) by disclosing and using the A12/A13 SecureROM access capability without the consent of Magnet Forensics and by means that Defendants knew or had reason to know constituted improper means.

95. Del Gaudio disclosed Magnet Forensics' trade secret information to Paradigm Shift in violation of his contractual and legal obligations to Magnet Forensics, including his obligation to maintain the secrecy of Confidential Information and Materials under the Agreement.

96. Paradigm Shift disclosed Magnet Forensics' trade secret to the public by publishing the usbliter8 Exploit Blog Post. Paradigm Shift knew or had reason to know that the information was not freely publishable and that it derived from an individual operating under a duty of confidentiality. A sophisticated offensive security firm does not come into possession of a detailed BootROM access capability of this nature without knowing its provenance.

97. Paradigm Shift's own stated specialization in "uncovering and exploiting zero-day vulnerabilities" confirms that it possessed the technical sophistication to recognize the provenance and proprietary nature of the information Del Gaudio provided. A company that holds itself out as an expert in zero-day

exploit research cannot credibly claim ignorance of the fact that a detailed, production-ready BootROM access capability was developed under conditions of confidentiality.

98. Defendants disclosed Magnet Forensics' trade secret to the public as part of a deliberate and commercially motivated strategy designed to generate commercial attention for Paradigm Shift's business by leveraging Magnet Forensics' proprietary research and presenting it as Paradigm Shift's own achievement. The Publication was calculated to establish Paradigm Shift's credibility in the zero-day exploit market and to induce entities encountering zero-day vulnerabilities to engage Paradigm Shift rather than Magnet Forensics. Defendants' conduct was not inadvertent, careless, or the result of any good-faith disagreement; it was a calculated act of commercial misappropriation.

99. Neither Del Gaudio nor Paradigm Shift had Magnet Forensics' express or implied authorization to disclose this trade secret information.

100. Defendants knew or had reason to know that they had acquired Magnet Forensics' trade secrets by improper means, including but not limited to Del Gaudio's breach of his confidentiality obligations and Paradigm Shift's inducement of Del Gaudio to breach those obligations.

101. Defendants' actions as described herein constitute misappropriation of Magnet Forensics' trade secrets in violation of the DTSA.

102. Defendants' actions were willful and malicious, which entitles Magnet Forensics to exemplary damages up to two times the amount of damages awarded for the actual monetary losses suffered by Magnet Forensics. 18 U.S.C. §1836(b)(3)(C).

103. Defendants' actions were willful and malicious, which entitles Magnet Forensics to recover attorneys' fees under 18 U.S.C. §1836(b)(3)(D).

104. Defendants' unlawful conduct has proximately caused and will continue to cause damages to Magnet Forensics. In addition to monetary damages, Magnet Forensics has suffered and will continue to suffer immediate and irreparable harm to its business, competitive position, and goodwill with customers, for which it has no adequate remedy at law.

105. The misappropriation threatens to eliminate the competitive advantage Magnet Forensics derives from the A12/A13 SecureROM access capability, enable competitors or unauthorized third parties to replicate or reverse-engineer Magnet Forensics' methodology without incurring the substantial time and expense that Magnet Forensics invested, and expose the vulnerability to potential patching by the device manufacturer, thereby rendering the access capability permanently valueless.

106. Once disclosed, the trade secret cannot be restored to its confidential status, and Magnet Forensics has suffered the permanent loss of its competitive

position, customer relationships, and the substantial investment it made in developing the access capability.

107. By virtue of Defendants continuing to possess and having publicly disclosed Magnet Forensics' trade secret information, Magnet Forensics remains at risk of Defendants' continued use and further dissemination of its trade secrets.

108. There is a substantial threat that Magnet Forensics will suffer irreparable injury to its business and operations if the injunction is not granted.

109. Defendants' misappropriation has caused and threatens to continue to cause harm to Magnet Forensics in at least three distinct respects: (a) direct competitive harm, in that competitors can now potentially utilize the disclosed access capability to develop and release competing products, thereby eroding the competitive advantage that Magnet Forensics invested years and substantial resources to build; (b) product viability risk, in that the public disclosure of the access capability has alerted Apple to the vulnerability, prompting Apple to develop a mitigation or patch that, once deployed, will degrade or eliminate the functionality of Magnet Forensics' products, rendering the access capability and the products that rely on it permanently valueless; and (c) reputational and market positioning risk, in that the unauthorized disclosure has eroded the discretion and proprietary nature of Magnet Forensics' research, which is critical to maintaining the trust and confidence of its law enforcement and government customers.

110. Magnet Forensics' threatened injury outweighs any harm the injunction may cause to Defendants, because Defendants have no right to use or disclose Magnet Forensics' property.

111. Granting injunctive relief will not disserve the public interest. The public interest supports the protection of trade secrets and the enforcement of contractual obligations.

112. A preliminary and permanent injunction enjoining Defendants from further misappropriation, use, or disclosure of Magnet Forensics' trade secrets is necessary to preserve the status quo and protect Magnet Forensics' legal rights.

## COUNT II
### Misappropriation of Trade Secrets in Violation of the Georgia Trade Secrets Act ("GTSA"), 18 O.C.G.A. §§ 10-1-760, *et seq.*
### (Against All Defendants)

113. Magnet Forensics restates and incorporates herein by reference all allegations set forth in the preceding paragraphs as if fully set forth herein.

114. The A12/A13 SecureROM access capability and its underlying research and development constitutes a "trade secret" within the meaning of the GTSA, O.C.G.A. § 10-1-761(4), because it is information that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

115.    Magnet Forensics took reasonable steps to maintain the secrecy of this trade secret information, including by limiting access to Magnet Forensics' trade secrets on a need-to-know basis, using password protected and encrypted electronic databases to maintain restricted access to such trade secret information, and by having Del Gaudio execute the Agreement, which includes intellectual property assignment, proprietary rights, and non-disclosure provisions. Magnet Forensics derives a competitive advantage from maintaining the confidentiality of the A12/A13 SecureROM access capability, which has independent, actual or potential economic value from not being generally known to or readily ascertainable by other persons who may obtain economic value from its disclosure or use.

116.    In particular, the A12/A13 SecureROM access capability is the product of extensive research, technical expertise, and significant investment by Magnet Forensics in identifying and developing a methodology to access devices through an unpatched security flaw, known as a "0-day vulnerability," for which no publicly available or manufacturer-issued fix exists. The development of this access capability required specialized knowledge and resources that are not generally known or readily ascertainable by Magnet Forensics' competitors or the public.

117.    The A12/A13 SecureROM access capability provides Magnet Forensics with a substantial competitive advantage in the digital forensics market by enabling its customers, including law enforcement agencies, intelligence agencies,

and other public and private sector entities, to access, recover, and preserve digital evidence from devices that would otherwise remain inaccessible. Without this access capability, Magnet Forensics' customers would be unable to extract critical evidence from certain devices that contain the zero-day vulnerability that the access capability targets.

118. Magnet Forensics is the owner of this trade secret, having developed and protected it as described above.

119. Upon information and belief, Defendants misappropriated and disclosed the A12/A13 SecureROM access capability within the meaning of O.C.G.A. §10-1-761(2).

120. Del Gaudio violated the GTSA by disclosing the A12/A13 SecureROM access capability to Paradigm Shift and publishing, or causing Paradigm Shift to publish, the usbliter8 Exploit Blog Post, in violation of his obligation to maintain its secrecy.

121. Paradigm Shift violated the GTSA by using the information provided by Del Gaudio about the A12/A13 SecureROM access capability to create the usbliter8, and then publishing the technical information in the usbliter8 Exploit Blog Post. Paradigm Shift knew or had reason to know that the trade secret was acquired by improper means, including Del Gaudio's breach of his duty to maintain secrecy.

122. Paradigm Shift's own stated specialization in "uncovering and exploiting zero-day vulnerabilities" confirms that it possessed the technical sophistication to recognize the provenance and proprietary nature of the information Del Gaudio provided. A company that holds itself out as an expert in zero-day exploit research cannot credibly claim ignorance of the fact that a detailed, production-ready BootROM access capability was developed under conditions of confidentiality.

123. Defendants disclosed Magnet Forensics' trade secret to the public as part of a deliberate and commercially motivated strategy designed to generate commercial attention for Paradigm Shift's business by leveraging Magnet Forensics' proprietary research and presenting it as Paradigm Shift's own achievement. The Publication was calculated to establish Paradigm Shift's credibility in the zero-day exploit market and to induce entities encountering zero-day vulnerabilities to engage Paradigm Shift rather than Magnet Forensics. Defendants' conduct was not inadvertent, careless, or the result of any good-faith disagreement; it was a calculated act of commercial misappropriation.

124. Neither Del Gaudio or Paradigm Shift had Magnet Forensics' express or implied authorization to disclose this trade secret information.

125. Defendants knew or had reason to know that they had acquired Magnet Forensics' trade secrets by improper means, including but not limited to Del

Gaudio's breach of his confidentiality obligations and Paradigm Shift's inducement of Del Gaudio to breach those obligations.

126.   Defendants' actions as described herein constitute misappropriation of Magnet Forensics' trade secrets in violation of the GTSA.

127.   Defendants' actions were willful, intentional, and/or malicious, which entitles Magnet Forensics to recover attorneys' fees under O.C.G.A. § 10-1-764.

128.   Defendants' unlawful conduct has proximately caused and will continue to cause damages to Magnet Forensics. In addition to monetary damages, Magnet Forensics has suffered and will continue to suffer immediate and irreparable harm to its business, competitive position, and goodwill with customers, for which it has no adequate remedy at law.

129.   The misappropriation threatens to eliminate the competitive advantage Magnet Forensics derives from the A12/A13 SecureROM access capability, enable competitors or unauthorized third parties to replicate or reverse-engineer Magnet Forensics' methodology without incurring the substantial time and expense that Magnet Forensics invested, and expose the vulnerability to potential patching by the device manufacturer, thereby rendering the access capability permanently valueless.

130.   Once disclosed, the trade secret cannot be restored to its confidential status, and Magnet Forensics has suffered the permanent loss of its competitive

position, customer relationships, and the substantial investment it made in developing the access capability.

131. By virtue of Defendants continuing to possess and having publicly disclosed Magnet Forensics' trade secret information, Magnet Forensics remains at risk of Defendants' continued use and further dissemination of its trade secrets.

132. There is a substantial threat that Magnet Forensics will suffer irreparable injury to its business and operations if the injunction is not granted.

133. Defendants' misappropriation has caused and threatens to continue to cause harm to Magnet Forensics in at least three distinct respects: (a) direct competitive harm, in that competitors can now potentially utilize the disclosed access capability to develop and release competing products, thereby eroding the competitive advantage that Magnet Forensics invested years and substantial resources to build; (b) product viability risk, in that the public disclosure of the access capability has alerted Apple to the vulnerability, prompting Apple to develop a mitigation or patch that, once deployed, will degrade or eliminate the functionality of Magnet Forensics' products, rendering the access capability and the products that rely on it permanently valueless; and (c) reputational and market positioning risk, in that the unauthorized disclosure has eroded the discretion and proprietary nature of Magnet Forensics' research, which is critical to maintaining the trust and confidence of its law enforcement and government customers.

134.   Magnet Forensics' threatened injury outweighs any harm the injunction may cause to Defendants, because Defendants have no right to use or disclose Magnet Forensics' property.

135.   Granting injunctive relief will not disserve the public interest. The public interest supports the protection of trade secrets and the enforcement of contractual obligations.

136.   A preliminary and permanent injunction is necessary and appropriate under O.C.G.A. § 10-1-762 to prevent further misappropriation and to preserve the status quo.

## COUNT III
### Breach of Contract
### (Against Del Gaudio)

137.   Magnet Forensics restates and incorporates herein by reference all allegations set forth in the preceding paragraphs as if fully set forth herein.

138.   Del Gaudio entered into a valid and enforceable Agreement, supported by adequate consideration, including his placement with Magnet Forensics, new and additional training, access to Magnet Forensics' customers, and access to Magnet Forensics' confidential and proprietary information.

139.   The restrictive covenants contained in the Agreement, including the non-disclosure provision, the proprietary rights provision, and the intellectual property assignment provision  remain in full force after Del Gaudio's termination

of service to Magnet Forensics. Del Gaudio remains bound by these restrictive covenants.

140.   Del Gaudio has breached the Agreement in multiple respects, including but not limited to the following:

(a) Del Gaudio breached Section 5.1 of the Agreement by disclosing Magnet Forensics' Confidential Information to Paradigm Shift and by publishing, or causing Paradigm Shift to publish, the usbliter8 Exploit Blog Post containing Magnet Forensics' Confidential Information;

(b) Del Gaudio breached Sections 3.1 and 3.2 of the Agreement by disclosing Materials to third parties and by failing to hold Materials in trust and strict confidence for the Company;

(c) Del Gaudio breached Sections 4.2 and 4.4 of the Agreement by asserting control over Company Inventions, by publishing or causing the publication of Company Inventions without authorization, and by asserting Moral Rights that he expressly and irrevocably waived; and

(d) Del Gaudio breached Section 5.3 of the Agreement by failing to promptly notify an executive officer of Magnet Forensics upon becoming aware of the unauthorized use of Confidential Information by Paradigm Shift.

141. Del Gaudio's breaches of the Agreement have caused and will continue to cause Magnet Forensics to suffer monetary and other damages for which Magnet Forensics is entitled to under Georgia law.

142. Magnet Forensics is entitled to recover its costs, expenses, and reasonable attorneys' fees pursuant to Section 13 of the Agreement.

143. Magnet Forensics is also entitled to an award of its attorneys' fees and the costs of this litigation pursuant to O.C.G.A. § 13-6-11 because Del Gaudio has acted in bad faith, has been stubbornly litigious, and has caused Magnet Forensics unnecessary trouble and expense.

## COUNT IV
### Tortious Interference with Business Relationships
### (Against All Defendants)

144. Magnet Forensics restates and incorporates herein by reference all allegations set forth in the preceding paragraphs as if fully set forth herein.

145. At all times relevant hereto, Magnet Forensics maintained valuable business relationships with its customers, including law enforcement agencies, intelligence agencies, government entities, and private sector organizations to which it offered or provided the A12/A13 SecureROM access capability and related digital forensics services.

146. Defendants were aware of, or should have been aware of, these business relationships. Del Gaudio had direct knowledge of Magnet Forensics' customer

relationships from his tenure as an Exploit Engineer. Paradigm Shift, as an entity seeking to monetize access capabilities, was aware of Magnet Forensics' customer base.

147.   Defendants purposely and without justification or privilege disclosed Magnet Forensics' confidential information and trade secrets to the public with the intent to injure Magnet Forensics' business and to gain an unfair competitive advantage over Magnet Forensics.

148.   By publishing the usbliter8 Exploit Blog Post and disclosing Magnet Forensics' proprietary access capability methodology, Defendants sought to induce Magnet Forensics' current and prospective customers to terminate or refrain from engaging in business with Magnet Forensics, and to instead seek digital investigative solutions from Paradigm Shift.

149.   Defendants' publication undermined Magnet Forensics' competitive position by making publicly available a capability that had previously been exclusively available to Magnet Forensics' customers, thereby diminishing the value of Magnet Forensics' offerings and its customer relationships.

150.   Defendants' wrongful conduct has proximately caused Magnet Forensics damages in an amount to be determined at trial.

151.   To the extent this claim is based on the same conduct as Magnet Forensics' trade secret claims, it is pleaded in the alternative.

-46-

152. Magnet Forensics is also entitled to an award of its attorneys' fees and the costs of this litigation pursuant to O.C.G.A. § 13-6-11 because Paradigm Shift has acted in bad faith, has been stubbornly litigious, and has caused Magnet Forensics unnecessary trouble and expense.

153. Paradigm Shift's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care would raise the presumption of conscious indifference to consequences, such that Magnet Forensics is entitled to punitive damages in an amount to be determined at trial.

**COUNT V**
**Tortious Interference with Contract**
**(Against Paradigm Shift)**

154. Magnet Forensics restates and incorporates herein by reference all allegations set forth in the preceding paragraphs as if fully set forth herein.

155. Del Gaudio was and remains subject to enforceable contractual obligations to Magnet Forensics, including an obligation to not use or disclose Magnet Forensics' Confidential Information, including trade secrets, or Materials for his own benefit or purposes or for the benefit or purposes of any person or entity, to return all Company property upon the termination of his placement, and to promptly notify Magnet Forensics of any unauthorized use of Confidential Information by any party. These covenants and obligations are supported by sufficient consideration, including but not limited to Del Gaudio's placement with

Magnet Forensics, new and additional training he received during his placement, access to Magnet Forensics' customers, and access to Magnet Forensics' confidential and proprietary market knowledge, pricing information, and other Confidential Information, and expressly survive the termination of Del Gaudio's placement in perpetuity.

156. At all times relevant, Paradigm Shift was fully aware or should have been aware of the existence of Del Gaudio's contractual obligations to Magnet Forensics, including the confidentiality obligations. Given Del Gaudio's prior role as an Exploit Engineer at Magnet Forensics and the nature of the technical information he brought to Paradigm Shift, Paradigm Shift knew or should have known that he was subject to binding post-placement obligations prohibiting the disclosure of his former client's proprietary information.

157. Paradigm Shift wrongfully and without justification, legitimate financial interest, or competitive privilege induced Del Gaudio to breach his contractual obligations to Magnet Forensics by encouraging, incentivizing, or facilitating Del Gaudio's disclosure of Magnet Forensics' trade secret and confidential information to Paradigm Shift.

158. The non-disclosure covenants at issue are reasonable as to time, scope, and subject matter. Magnet Forensics has valid business reasons for imposing these restrictions, and the covenants do not impose an unreasonable restraint upon Del

Gaudio that is greater than necessary to protect Magnet Forensics' legitimate business interests.

159. At all relevant times, Paradigm Shift was a stranger to the Agreement between Magnet Forensics and Del Gaudio. Paradigm Shift was not a signatory to the Agreement, was not an intended or unintended beneficiary of the Agreement, had no legitimate privilege or financial interest in the Agreement, and was not part of any interwoven contractual arrangement between Magnet Forensics and Del Gaudio.

160. Paradigm Shift's conduct was intentional and for the improper and wrongful purposes of unlawfully and unfairly competing with Magnet Forensics and harming Magnet Forensics' business by appropriating Magnet Forensics' proprietary capabilities and presenting them as its own.

161. Magnet Forensics has suffered injury and damages as a direct and proximate result of Paradigm Shift's tortious interference, including but not limited to the destruction of the confidentiality of a proprietary capability, damage to its competitive position, lost profits, mitigation expenses, and loss of value, goodwill, and customer relationships.

162. To the extent this claim is based on the same conduct as Magnet Forensics' trade secret claims, it is pleaded in the alternative.

163. Magnet Forensics is entitled to an award of its attorneys' fees and the costs of this litigation pursuant to O.C.G.A. § 13-6-11 because Paradigm Shift has acted in bad faith, has been stubbornly litigious, and has caused Magnet Forensics unnecessary trouble and expense.

164. Paradigm Shift's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care would raise the presumption of conscious indifference to consequences, such that Magnet Forensics is entitled to punitive damages in an amount to be determined at trial.

### COUNT VI
### Unjust Enrichment
### (Against All Defendants)

165. Magnet Forensics restates and incorporates herein by reference all allegations set forth in the preceding paragraphs as if fully set forth herein.

166. This Count is pleaded in the alternative to the extent that any of Magnet Forensics' other claims are determined to be unavailable or insufficient.

167. Magnet Forensics conferred a benefit upon Defendants by developing, at great cost and effort, the A12/A13 SecureROM access capability and sharing its confidential and trade secret information with Del Gaudio during the term of his placement with Magnet Forensics.

168. Del Gaudio, in turn, shared Magnet Forensics' confidential and trade secret information with Paradigm Shift.

169. Defendants have knowledge of and have accepted and retained the benefit of Magnet Forensics' confidential and trade secret information.

170. Defendants have been unjustly enriched by their unauthorized use and disclosure of Magnet Forensics' trade secret information, including by using it to develop, market, and sell competing products and services.

171. It would be inequitable for Defendants to retain the benefits derived from the misappropriation of Magnet Forensics' trade secret information without compensating Magnet Forensics.

172. Defendants are liable to Magnet Forensics for the benefits they have received (and continue to receive) in an amount to be determined at trial.

## COUNT VII
### Civil Conspiracy
### (Against All Defendants)

173. Magnet Forensics restates and incorporates herein by reference all allegations set forth in the preceding paragraphs as if fully set forth herein.

174. Defendants entered into an agreement, express or implied, to accomplish an unlawful objective—namely, the misappropriation and public disclosure of Magnet Forensics' trade secrets and confidential information—or to accomplish a lawful objective by unlawful means.

175. Specifically, Defendants agreed to and acted in concert to: (a) utilize the confidential and trade secret information about the A12/A13 SecureROM access

capability that Del Gaudio obtained during his placement with Magnet Forensics; (b) develop Paradigm Shift's own version of the access capability using Magnet Forensics' proprietary methodology and technical information; (c) disclose the access capability and its underlying technical details to the public through the usbliter8 Exploit Blog Post; and (d) market the access capability as Paradigm Shift's own invention.

176.    In furtherance of this conspiracy, Defendants committed the overt and unlawful acts described in this Complaint, including misappropriation of trade secrets, breach of contract, and tortious interference.

177.    Magnet Forensics has been damaged as a result of Defendants' conspiracy in an amount to be determined at trial.

178.    To the extent this claim is based on the same conduct as Magnet Forensics' trade secret claims, it is pleaded in the alternative.

179.    Magnet Forensics is entitled to an award of its attorneys' fees and the costs of this litigation pursuant to O.C.G.A. § 13-6-11 because Defendants have acted in bad faith, have been stubbornly litigious, and have caused Magnet Forensics unnecessary trouble and expense.

180.    Defendants' conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care would raise the presumption of

conscious indifference to consequences, such that Magnet Forensics is entitled to punitive damages in an amount to be determined at trial.

WHEREFORE, Magnet Forensics respectfully requests the following relief:

a.  Compensatory, consequential, and incidental damages in an amount to be determined at trial;

b.  Disgorgement of all profits that Defendants earned through their unlawful and wrongful conduct;

c.  Exemplary damages of up to two times the amount of actual damages for willful and malicious misappropriation under 18 U.S.C. § 1836(b)(3)(C);

d.  Multiple and/or punitive damages as permitted by contract, statute, or other applicable law, including but not limited to multiple or punitive damages based on Defendants' intentional and malicious conduct;

e.  Preliminary and permanent injunctive relief:

  i.  Restraining Defendants from directly or indirectly disclosing, publishing, disseminating, distributing, or otherwise communicating or making available to any person or entity any of Magnet Forensics' confidential information, trade secrets, or proprietary information, including but not limited to any information relating to the A12/A13 SecureROM access capability;

ii. Restraining Defendants from directly or indirectly using, reproducing, reverse-engineering, or exploiting Magnet Forensics' confidential information, trade secrets, or proprietary information, including but not limited to the A12/A13 SecureROM access capability, for any purpose;

iii. Restraining Defendants from directly or indirectly soliciting, inducing, or encouraging any person or entity to disclose, use, or exploit Magnet Forensics' confidential information, trade secrets, or proprietary information;

iv. Restraining Defendants from destroying, altering, concealing, or disposing of any documents, data, communications, or other materials relating to the A12/A13 SecureROM access capability, the Publication, or any communications between Del Gaudio and Paradigm Shift concerning the same;

v. Enforcing the restrictive covenants in the Agreement as to Del Gaudio, including but not limited to the non-disclosure, proprietary rights, and intellectual property assignment provisions thereof; and

vi. Restraining Defendants from further tortious interference with Magnet Forensics' business relationships and contracts;

f.      An order requiring Defendants to immediately remove the Publication titled "Introducing usbliter8: An A12/A13 SecureROM Exploit" and all associated proof-of-concept code, technical details, and derivative materials from all websites, platforms, repositories, and media on which it has been published or distributed, to the extent within Defendants' possession, custody, or control;

g.      An order requiring Defendants to identify and remove any and all other non-public discussions, analyses, presentations, demonstrations, marketing materials, or derivative works incorporating or based upon Magnet Forensics' proprietary information, in any medium or format, to the extent within Defendants' possession, custody, or control;

h.      An order requiring Defendants to immediately cease all promotion, marketing, advertising, commercial exploitation, and monetization of any product, service, tool, or capability derived from or incorporating Magnet Forensics' proprietary information, including but not limited to the capability branded by Paradigm Shift as "usbliter8";

i.      An order requiring Defendants to issue written takedown requests to all third-party platforms, media outlets, repositories, and services hosting or distributing the Publication or any cached, archived, or mirrored copies thereof, to the extent within Defendants' knowledge and ability, and to provide copies of all such

takedown requests to Magnet Forensics' counsel within forty-eight (48) hours of issuance;

j.      An order requiring Defendants to provide a sworn written disclosure, executed under penalty of perjury, identifying all persons and entities to whom Defendants disclosed, communicated, transmitted, or made available any of Magnet Forensics' confidential information, trade secrets, or proprietary information relating to the A12/A13 SecureROM access capability, whether orally, in writing, electronically, or by any other means, including the date and nature of each communication or disclosure, a description of the specific information communicated in each instance, and any consideration, compensation, or benefit received or expected by Defendants in connection with each such disclosure;

k.      An order requiring Defendants to create a complete forensic image of all devices, systems, storage media, and accounts containing any of Magnet Forensics' proprietary information, confidential information, trade secret information, Materials, or Company Inventions, and to deposit such forensic images with Defendants' outside counsel in escrow for purposes of this litigation;

l.      An order requiring Del Gaudio and Paradigm Shift to return to Magnet Forensics or permanently delete and destroy all Magnet Forensics property, including any confidential information, trade secret information, Materials, Company Inventions, and any derivatives, analyses, notes, compilations, or products

incorporating or derived from such information, in any form, that remain in their possession, custody, or control, and to certify such return or destruction under oath;

m. An order requiring Defendants to preserve all documents, communications, data, and materials of any kind relating to the A12/A13 SecureROM access capability, the Publication and all drafts, revisions, or prior versions thereof, any communications between Del Gaudio and Paradigm Shift or between either Defendant and any third party concerning the A12/A13 SecureROM access capability or the Publication, and any revenue, profits, compensation, or other benefits received or expected by either Defendant in connection with the disclosure or exploitation of the A12/A13 SecureROM access capability;

n. An order requiring each Defendant to provide Magnet Forensics' counsel with a sworn affidavit of compliance, executed under penalty of perjury, certifying full compliance with each obligation imposed by the Court's order;

o. An order requiring Paradigm Shift to retain, at its own expense, an independent third-party forensic auditor to conduct a forensic examination of Paradigm Shift's systems, devices, accounts, and repositories for the purpose of verifying compliance with the Court's order;

p. The imposition of a constructive trust over any profits, revenues, or other benefits Defendants have derived from the misappropriated trade secret information;

q.    Ex parte seizure of property necessary to prevent the propagation or dissemination of Magnet Forensics' trade secrets, to the extent authorized by 18 U.S.C. § 1836(b)(2);

r.    Attorneys' fees, costs, and expenses pursuant to 18 U.S.C. § 1836(b)(3)(D), O.C.G.A. § 10-1-764, O.C.G.A. § 13-6-11, Section 13 of the Agreement, and all other applicable law;

s.    Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

t.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Magnet Forensics demands a jury trial on all issues so triable.

Date: July 6, 2026

Respectfully Submitted,

TROUTMAN PEPPER LOCKE LLP

By: *Moses M. Tincher*
Moses M. Tincher
GA Bar No. 578906
600 Peachtree Street NE
Suite 3000
Atlanta, Georgia 30308
(404) 885-2593
moses.tincher@troutman.com

Attorneys for Plaintiff

-59-

Magnet Forensics, LLC

(Application for admission *Pro Hac Vice* for Andrea Martin forthcoming)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MAGNET FORENSICS, LLC,

 *Plaintiff,*

 v.

MARIO DEL GAUDIO and PARADIGM
SHIFT TECHNOLOGY, S.L.,

 *Defendants.*

Civil Action No.

## <u>VERIFICATION OF COMPLAINT</u>

I, Braden Thomas, hereby state as follows:

I am the Chief Research and Development Officer of Plaintiff Magnet Forensics, LLC ("Magnet Forensics").

I am authorized to verify the foregoing Verified Complaint for Injunctive Relief and Damages on behalf of Magnet Forensics.

I have read the Verified Complaint for Injunctive Relief and Damages and know that the factual allegations contained in the "Factual Background" section above are true to the best of my knowledge, based upon my personal knowledge, conversations with the employees of Magnet Forensics, and information obtained from the records of Magnet Forensics.

I verify the Verified Complaint for Injunctive Relief and Damages under the seal of Magnet Forensics.

-60-

I declare under penalty of perjury that the foregoing is true and correct.

Magnet Forensics, LLC

Signed by:

*Braden Thomas*

A19E6912BA1C47E...

By: Braden Thomas
Title: Chief Research and
Development Officer

7/6/2026