# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

MAGNET FORENSICS, LLC,

      Plaintiff,

v.

MARIO DEL GAUDIO and
PARADIGM SHIFT TECHNOLOGY,
S.L.,

      Defendants.

Civil Action No.
1:26-cv-03781-VMC

## OPINION, ORDER, AND PRELIMINARY INJUNCTION

Before the Court are the following motions:

- Plaintiff Magnet Forensics, LLC's Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2); and

- Plaintiff's Motion for Authorization to Serve Process on Defendants By Alternative Means Pursuant to Fed. R. Civ. P. 4(f) (3) and 4(h)(2) (Doc. 3)

(collectively, the "Motions"). The Court set a hearing on the Motions for July 16, 2026 ("Hearing"), and directed Plaintiff to serve the Complaint, the Motions, and the hearing notice on Defendants electronically. (Doc. 5). Despite being served, (Doc. 8), Defendants did not file a response or appear at the Hearing (*see* Doc. 10). After the Hearing, the Court took the Motions under advisement.[1] This Opinion

---

[1] After the Hearing, Magnet filed the Declaration of Ankit Patel dated July 17, 2026 ("Patel Decl.," Doc. 11). Even though the Declaration was filed after the Hearing,

and Order constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(2). For the reasons that follow, the Court enters the following Order.

## Background[2]

### I.    Mr. Del Gaudio's Employment with Magnet Forensics

Magnet Forensics ("Magnet") is a leading developer of digital investigation solutions that enable law enforcement agencies, intelligence agencies, and government entities worldwide to lawfully access, recover, and analyze digital evidence. (Doc. 1 ¶ 1). It develops highly sensitive and proprietary capabilities that represent the product of years of substantial investment in research, development, and engineering expertise. (*Id.*).

Defendant Mario Del Gaudio worked as an Exploit Engineer placed with Magnet from November 2023 through November 2024. (*Id.* ¶ 2). As a condition of his placement, Mr. Del Gaudio executed a Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement (the "Agreement"), which

---

the Court will exercise its discretion to consider it because it addresses questions the Court raised for the first time at the Hearing. *See* Fed. R. Civ. P. 43(c) ("When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions."); Fed. R. Civ. P. 6(c)(2) (permitting supporting affidavits be served "at least 7 days before the hearing, unless the court permits service at another time").

[2] The Court omits quotation marks from Complaint and record excerpts to improve readability.

imposed binding obligations of confidentiality, non-disclosure, intellectual property assignment, and return of company property—all of which expressly survive the termination of his placement. (*Id.*; Doc. 1-1). During his tenure, Mr. Del Gaudio was assigned to work on one of Magnet's most sensitive proprietary capabilities: a zero-day[3] access capability internally designated as "MSG." (Doc. 1 ¶ 2).

From March 11, 2024 through March 15, 2024, Mr. Del Gaudio traveled to the United States to attend a team-wide offsite meeting held in Denver, Colorado. (Patel Decl. ¶ 8, Doc. 11). The "offsite" was a joint meeting of the entire research team, comprising approximately 40 people. (*Id.*). During this meeting, team members presented technical information about their ongoing projects and research efforts. (*Id.*). In addition to the larger team-wide sessions, Magnet maintained a separate, dedicated space at the offsite for just the iOS team and its collaborators. (*Id.* ¶ 9). Attendance in this dedicated space was restricted to fewer than 20 individuals at any given time. The purpose of this smaller, restricted

---

[3] "A zero-day is a specific type of security vulnerability that has been publicly disclosed or exploited but the vendor who makes the affected hardware or software has not been given time (or 'zero days') to fix the problem." Zack Whittaker, et al., *The TechCrunch Cyber Glossary*, TechCrunch (April 25, 2025), https://techcrunch.com/2025/04/25/techcrunch-reference-guide-to-security-terminology/#zero-day [https://perma.cc/E3RT-D2PV].

setting was to facilitate focused discussion of the iOS team's most sensitive ongoing research, including work related to access capabilities. (*Id.*).

Mr. Del Gaudio attended the offsite in his capacity as an Exploit Engineer on the iOS team. (*Id.* ¶ 10). He was present for both the larger team-wide sessions and the smaller, restricted iOS team sessions throughout the duration of the offsite. (*Id.*). The smaller team meetings discussed the technical details of the A12/A13 SecureROM vulnerability that MSG targets and the processes for building access capabilities to utilize the information for Magnet's proprietary business models. (*Id.* ¶ 11). In these meetings, Mr. Del Gaudio did not merely hear about the MSG development process in passing, rather he was on the team to work with the operation and develop the operation, technical architecture and capability. (*Id.* ¶ 12). Mr. Del Gaudio's access to Magnet's proprietary systems and network during his time in Denver gave him access to review and interact with its confidential and trade secret information through both in-person discussions with team members and remote access to its electronic systems. (*Id.* ¶ 14).

## II.    The Agreement

Under the terms of the Agreement, Mr. Del Gaudio acknowledged that his placement with Magnet was one of "trust and responsibility with access to Confidential Information, trade secrets, and other information concerning

employees and customers of the Company." (Doc. 1 ¶ 39). Section 5.1 of the

Agreement contains a non-disclosure provision:

> Employee covenants and agrees not to, directly or indirectly: (i) misappropriate, disclose, transfer, assign, disseminate or otherwise communicate or make available (orally, in writing or otherwise) to any person or entity any Confidential Information, or any part thereof; or (ii) use or reproduce (in whatever form) any Confidential Information for his own benefit or purposes or for the benefit or purposes of any person or entity, except as may be reasonably necessary in the performance of the duties and responsibilities of Employee hereunder and in the best interests of the Company or as otherwise may be authorized expressly in writing by the Company.

(*Id.* ¶ 41). Confidential Information is defined in Section 5.1 of the Agreement to

include, without limitation:

> [I]nformation containing or concerning business strategies, customers, prospective customers, pricing practices, contracts, marketing and all other information that belongs to or relates to the Company and its business that is essential to the protection of the goodwill of the Company and/or any of its Affiliates and to the maintenance of their competitive position in the industry and that, the disclosure or improper use of which would be highly detrimental to the Company and/or any of its Affiliates . . . Confidential Information shall also include any and all information about the Company that is not generally known or available to the public, but has been developed, acquired or compiled by the Company at great effort and expense.

(*Id.* ¶ 42). Mr. Del Gaudio and Magnet agreed that the non-disclosure provision

"shall survive the termination of Employee's placement with the Company for any

5

reason whatsoever and shall remain in full force and effect so long as the Confidential Information remains confidential." (*Id.* ¶ 43).

### III.   The Publication

After his placement with Magnet ended, Mr. Del Gaudio became affiliated with Defendant Paradigm Shift, an entity in the technology and cybersecurity industry in the business of monetizing access capabilities. (*Id.* ¶ 3). On June 18, 2026, Paradigm Shift published a detailed technical blog post titled "Introducing usbliter8: An A12/A13 SecureROM Exploit" (the "Publication"), which disclosed extensive technical details regarding a proprietary access capability that is, in substance, the same capability Mr. Del Gaudio worked on at Magnet under the MSG designation. (*Id.*).

Magnet asserts the following facts support the conclusion that Mr. Del Gaudio is directly responsible for, or materially contributed to, this disclosure based on the following:

> (a) Del Gaudio had direct access to and documented involvement in the development of the precise capability that is the subject of the Publication during his placement with Magnet Forensics;
>
> (b) Following the expiration of his placement, Del Gaudio became affiliated with Paradigm Shift — the entity that published the capability;
>
> (c) A preserved screenshot obtained by Magnet Forensics links Del Gaudio's name and photograph to the @NotHdesk account, which has been identified as an

6

author, contributor, or individual directly associated with the Publication; and

(d) The @NotHdesk account identifier is directly connected to Del Gaudio's known personal email address, mario@athdesk.me, confirming the link between his identity and that account.

(*Id.* ¶ 70).

Magnet sent a cease-and-desist letter to Mr. Del Gaudio the same day as the publication demanding, among other things, he stop further disclosure and remove the Publication. (*Id.* ¶ 76). The following day, on June 19, 2026, Magnet sent Paradigm Shift a cease-and-desist letter demanding that Paradigm Shift take similar action. (*Id.* ¶ 77). Despite some back and forth between the parties and their counsel, the Publication has not been taken down. This lawsuit followed.

## Discussion

### I.  Motion for Service by Alternative Means

Defendants are both located abroad. Rule 4(f) governs service of process in a foreign country. It provides three options for serving foreign defendants:

> Serving an Individual in a Foreign Country. Unless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver has been filed—may be served at a place not within any judicial district of the United States:
>
> > (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

(A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

(B) as the foreign authority directs in response to a letter rogatory or letter of request; or

(3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f); *see also* Fed. R. Civ. P. 4(h)(2) (largely incorporating methods of serving foreign individuals to serving foreign corporations, partnerships, or other unincorporated associations). Courts have held that under certain circumstances, Rule 4(f)(3) permits the Court to enter an order directing service of process abroad by email. *See, e.g.*, *In re Int'l Telemedia Assocs., Inc.*, 245 B.R. 713 (Bankr. N.D. Ga. 2000). But "[a] federal court would be prohibited from issuing a Rule 4(f)(3) order in contravention of an international agreement, including the Hague Convention referenced in Rule 4(f)(1)." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 n.4 (9th Cir. 2002).

Magnet argues that it "is not required to first attempt service through the Hague Convention before seeking authorization for alternative service under Rule 4(f)(3)." (Doc. 3 at 9). But this seems contrary to the Supreme Court's instruction in *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988) that

8

"compliance with the Convention is mandatory in all cases to which it applies." The cases that Magnet cites for the proposition that a service order under Rule 4(f)(3) does not need to follow service attempts under Rules 4(f)(1) or 4(f)(2) do not appear to have been within the Convention's scope. *De Gazelle Grp., Inc. v. Tamaz Trading Establishment*, 817 F.3d 747, 749 (11th Cir. 2016) (Saudi Arabia)[4]; *Rio Props., Inc.*, 284 F.3d at 1015 ("The parties agree, however, that the Hague Convention does not apply in this case because Costa Rica is not a signatory."); *Jagex Ltd. v. 31 Store*, No. 1:26-cv-1895-MHC, 2026 WL 1830758, at *2 (N.D. Ga. Apr. 10, 2026) ("Plaintiff is not required to serve any Defendant pursuant to the Hague Convention where the Defendant's address is unknown. . . ."); *Boardriders IP Holdings, LLC v. Abouthouse*, No. 1:25-cv-06374-SEG, 2025 WL 4479292, at *2 (N.D. Ga. Nov. 17, 2025) (same).[5]

---

[4] Saudi Arabia is not a party to the Hague Convention. Kingdom of Saudi Arabia, Travel.State.Gov, https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/SaudiArabia.html (last updated March 30, 2018).

[5] As one Court noted, an artificial "consensus that authorizing email service on a defendant located in China," a party to the Convention, has emerged in counterfeiting cases because those cases were decided ex parte on an emergency basis where there was "no indication that plaintiffs' counsel brought to the court's attention the contrary legal authority . . . or the fact that the plaintiff had access to return addresses for the defendants." *Luxottica Grp. S.p.A. v. Partnerships & Unincorporated Associations Identified on Schedule "A"*, 391 F. Supp. 3d 816, 827 (N.D. Ill. 2019). The continued practice in these "Schedule A" cases of relying on a strained reading of cases where the Convention did not apply to assert that compliance with the Convention is optional is at best misleading.

That said, "Article 10 of the Hague Convention states that '[p]rovided the State of destination does not object, the present Convention shall not interfere with . . . the freedom to send judicial documents, by postal channels, directly to persons abroad," meaning service by mail is appropriate in some circumstances. *Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329, 331 (S.D.N.Y. 2015) (quoting Hague Convention art. 10(a), November 15, 1965); *Water Splash, Inc. v. Menon*, 581 U.S. 271, 284 (2017) ("Article 10(a) encompasses service by mail. . . ."). Both Italy[6] and Spain[7] do not object to Article 10(a) service methods. And several persuasive authorities have held that private international courier service is the equivalent of service by postal channels. Conclusions and Recommendations Adopted by the Special Commission on the Practical Operation of the Hague Apostille, Evidence and Service Conventions at 11, https://assets.hcch.net/docs/0edbc4f7-675b-4b7b-8e1c-2c1998655a3e.pdf (Nov. 20, 2003) (concluding in light of the "increasing use of private courier services for the expeditious transmission of documents in a variety of business settings . . . that for the purposes of Article 10(a) the use of a private courier was the equivalent of the postal channel."); *Willamette Green*

---

[6] Italian Republic, Travel.State.Gov, https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/Italy.html (last updated Nov. 15, 2013).

[7] Kingdom of Spain, Travel.State.Gov, https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/Spain.html (last updated July 31, 2019).

*Innovation Ctr., LLC v. Quartis Cap. Partners*, No. 13-CV-00848-JCS, 2014 WL 5281039, at *5 (N.D. Cal. Jan. 21, 2014), *report and recommendation adopted*, 2014 WL 5260921 (N.D. Cal. Apr. 10, 2014); *Micula v. Gov't of Romania*, No. 17-CV-02332 (APM), 2018 WL 10196624, at *3 (D.D.C. May 22, 2018); *W.J. Deutsch & Sons Ltd. v. Zamora*, No. 1:21-CV-11003-LTS, 2023 WL 5609205, at *7 (S.D.N.Y. Aug. 30, 2023); *Fornix Holdings LLC v. Unknown Party*, No. CV-24-03383-PHX-KML, 2025 WL 81323, at *1 (D. Ariz. Jan. 13, 2025). Because Magnet intends to serve process by international courier in addition to email, the Court need not decide whether email is a "postal channel"; Magnet's proposed method of service is not prohibited by an international agreement. It also comports with due process for the reasons Magnet gave in its motion (Doc. 3 at 10). The Court will grant Magnet's motion for alternative service.

## II.    Preliminary Injunction[8]

Magnet's Complaint raises seven claims, but Magnet seeks injunctive relief based only on three: Count I for Misappropriation of Trade Secrets in Violation of

---

[8] Magnet sought both a temporary restraining order and a preliminary injunction. The Court directed Defendants be given notice (Doc. 5), Magnet gave them notice (Doc. 8), and Defendants failed to appear at the hearing (*see* Doc. 10). Thus, there is no functional difference between a preliminary injunction and a temporary restraining order at this point. *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1320 (N.D. Ga.), *aff'd*, 981 F.3d 1307 (11th Cir. 2020) (citing *Windsor v. United States*, 379 F. App'x 912, 916–17 (11th Cir. 2010)). ("The standard for the issuance of a temporary restraining order and a preliminary injunction are identical.").

11

the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(B)(1), *et seq.*, against all Defendants, Count II for Misappropriation of Trade Secrets in Violation of the Georgia Trade Secrets Act ("GTSA"), O.C.G.A. §§ 10-1-760, *et seq.*, against all Defendants, and Count III for Breach of Contract, against Mr. Del Gaudio.

A preliminary injunction is "an extraordinary remedy." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). A district court has broad discretion to grant injunctive relief if the movant shows: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301,1306 (11th Cir. 1998). "In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

### A.    Likelihood of Success on the Merits – Trade Secrets Claims

"A claim for misappropriation of trade secrets under the Georgia Trade Secrets Act requires a plaintiff to prove that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret." *Cap. Asset Rsch. Corp. v. Finnegan*, 160 F.3d 683, 685 (11th Cir. 1998) (citation modified). The same showings

are required under the DTSA but with the additional requirement that the trade secret "is related to a product or service used in, or intended for use in, interstate or foreign commerce." *Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1348 (N.D. Ga. 2017) (quoting 18 U.S.C. § 1836(b)(1)).

Under both statutes, a trade secret is defined as (1) any type of information (including processes), (2) that derives independent economic value from being kept secret, and (3) that is kept secret. *See* 18 U.S.C. § 1839(3); O.C.G.A. § 10-1-761(4). Misappropriation is the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means . . . or disclosure or use of a trade secret or another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5)(A)–(B); O.C.G.A. § 10-1-761(2)(A)–(B).

At the Hearing, the Court raised a threshold issue: whether the DTSA applies at all to the conduct alleged in this case which occurred outside of the United States. Chapter 90 of Title 18 (which includes the DTSA), "applies to conduct occurring outside the United States if" —

> (1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or
>
> (2) an act in furtherance of the offense was committed in the United States.

18 U.S.C. § 1837. Because neither Defendant is a citizen, permanent resident, or U.S. entity, the Court must consider whether an act in furtherance of the offense was committed in the United States.

The Seventh Circuit explored this issue in detail in *Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd.*, 108 F.4th 458, 484 (7th Cir. 2024), *reh'g and reh'g en banc dismissed*, No. 22-2370, 2024 WL 4416886 (7th Cir. Oct. 4, 2024), *and cert. denied*, 145 S. Ct. 1182 (2025). To determine whether an "act" was committed in the United States, the court looked to the DTSA's definition of "misappropriation." "The DTSA defines 'misappropriation' as 'acquisition of a trade secret' by 'improper means,' or 'disclosure or use of a trade secret' by an unauthorized person meeting certain other conditions." *Id.* (quoting 18 U.S.C. § 1839(5)(A)–(B)). Thus, "misappropriation can occur through any of three actions: (1) acquisition, (2) disclosure, or (3) use." *Id.* (quoting *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 436 F. Supp. 3d 1150, 1163 (N.D. Ill. 2020)). "The DTSA does not further define 'use,'" but the court defined "use" as "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant," including "marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret." *Id.* (quoting *Motorola Sols.*, 436 F. Supp. 3d at

14

1164).  In that case, "[t]he district court found that 'use' of the alleged trade secrets had occurred in the United States because [the defendant] had advertised, promoted, and marketed products embodying the stolen trade secrets at numerous trade shows in the United States," and the Seventh Circuit affirmed. *Id.* (citing *Motorola Sols.*, 436 F. Supp. 3d at 1165).

Courts have held that domestic "'acts in furtherance' of misappropriation need not be committed by [each] defendant for DTSA to apply." *Bepex Int'l, LLC v. Micron BV*, No. 19-cv-2997, 2023 WL 2975699, at *7 (D. Minn. Apr. 17, 2023) (citing *vPersonalize Inc. v. Magnetize Consultants Ltd.*, 437 F. Supp. 3d 860, 878–79 (W.D. Wash. 2020). This is because "the extraterritoriality provision of § 1837(2) requires only that 'an act in furtherance of the offense was committed in the United States,'" but "does not require the *defendant* to have committed such act." *vPersonalize*, 437 F. Supp. 3d at 878–79. "Accordingly, courts have applied DTSA to cases in which defendants acquired stolen trade secrets through a United States intermediary, or disclosed trade secrets to a web developer in the United States, because the acts of those third parties furthered the misappropriation and occurred in the United States." *Bepex*, 2023 WL 2975699, at *7 (citing *vPersonalize*, 437 F. Supp. 3d at 878–79 and *Herrmann Int'l, Inc. v. Herrmann Int'l Eur.*, No. 1:17-cv-00073, 2021 WL 861712, at *17 (W.D.N.C. Mar. 8, 2021)) (internal citations omitted).

15

Here, the uncontested record evidence permits an inference that Mr. Del Gaudio at least partially acquired knowledge of the MSG vulnerability in the United States during the March 2024 offsite meeting in Denver, Colorado. (Patel Decl. ¶ 8–11). From March 11, 2024 through March 15, 2024, Mr. Del Gaudio traveled to the United States to attend a team-wide offsite meeting held in Denver, Colorado. (Patel Decl. ¶¶ 8–14, Doc. 11). Because this act occurred in the United States and the information acquired was later disclosed by Paradigm Shift in the Publication, the Court finds that the DTSA applies to the international conduct at issue here.[9]

Next, the Court finds that the MSG access capability constitutes a trade secret. As the Court noted above, under both federal and Georgia law, a trade secret includes a "process," and the MSG exploit is a process. 18 U.S.C. § 1839(3); O.C.G.A. § 10-1-761(4); *Process*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/process [perma.cc/PJ4E -Z86B] ("**e:** a particular method or system of doing something, producing something, or accomplishing a specific result"). It is kept secret and its value is in its secrecy, because if discovered, it would be patched and no longer of commercial

---

[9] At least one court has found that the GTSA applies to conduct outside of the state of Georgia where the harm is felt in Georgia. *EchoSpan, Inc. v. Medallia, Inc.*, No. 22-CV-01732-NC, 2024 WL 3463967, at *1–2 (N.D. Cal. Jan. 17, 2024), *reconsideration denied*, No. 22-CV-01732-NC, 2026 WL 1349598 (N.D. Cal. May 14, 2026).

value. 18 U.S.C. § 1839(3); O.C.G.A. § 10-1-761(4). And the record shows that Mr. Del Gaudio acquired the trade secret and Paradigm Shift used it, constituting acts of misappropriation. Accordingly, Magnet has established a likelihood of success on the merits.

### B.    Likelihood of Success on the Merits – Breach of Contract

Magnet's breach of contract claim is much more straightforward. Mr. Del Gaudio agreed not to disclose Confidential Information, and the Agreement's definition of Confidential Information is broad enough to cover the MSG exploit. (Doc. 1 ¶ 39; ¶ 41). The parties agreed that the Agreement was to be governed by Georgia law and be heard in a state or federal court in Fulton County, Georgia (the site of this Court), with "[a]ll jurisdictional requirements and objections to venue . . . deemed expressly waived by signing this Agreement below." (Doc. 1-1 ¶ 12). Magnet has established a sufficient factual record to support an inference that Mr. Del Gaudio disclosed Confidential Information to Paradigm Shift in violation of the Agreement.

### C.    Irreparable Injury

The DTSA does not contain a statutory presumption of irreparable harm. *Pliteq, Inc. v. Mostafa*, 775 F. Supp. 3d 1231, 1256 (S.D. Fla. 2025) (citing *Castellano Cosm. Surgery Ctr., P.A. v. Rashae Doyle, P.A.*, No. 21-cv-1088, 2021 WL 3188432, at *8 (M.D. Fla. July 28, 2021)). At the Hearing, the Court questioned whether

17

anything can ever really be taken down from the internet, and whether it is truly possible to restore Magnet to the status quo before the Publication. Magnet answered that there is always an impact from stopping the bleeding, and that there was the risk of further disclosures occurring absent the deterring effect of injunctive relief. As the Court explains in the public interest section below, injunctive relief may not prevent Apple from patching the vulnerability, and at some point the remedy of damages will have to suffice. However, the Court agrees with Magnet that at this early stage, there is still further harm to be prevented.

### D.    Balance of Hardships

Magnet has established the prospect of severe damage to its business interests as a result of the Publication. Defendants, on the other hand, did not bother to appear despite having actual notice and an opportunity to respond. This weighs against a finding of hardship to the Defendants. Moreover, the Court finds that the hardship posed by taking down the Publication and ceasing any financial benefit from using the MSG exploit would be minimal. Magnet has satisfied this factor.

### E.    Public Interest

The Court struggled most with the public interest factor. In the ordinary case, there is "a strong public policy for protecting trade secrets from misappropriation." *Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc.*, 793

F. Supp. 2d 1302, 1315 (N.D. Ga. 2011) (citing *Wesley–Jessen, Inc. v. Armento,* 519 F. Supp. 1352, 1361 (N.D. Ga. 1981)). However, this is not an ordinary case.

There is a great deal of controversy around the fact that companies like Apple do not provide "backdoor" access to their encrypted devices to law enforcement. As Apple has explained, once such a backdoor is created, "the encryption can be defeated by anyone with that knowledge," putting "customers — including tens of millions of American citizens" at risk "from sophisticated hackers and cybercriminals." *A Message to Our Customers*, Apple.com https://www.apple.com/customer-letter/  (Feb. 16, 2016) [perma.cc/E7AG-YC7S]. This practice has led to the proliferation of state and private actors such as Magnet maintaining databases of zero-day exploits to provide access to law enforcement. This has, in turn, spurred a debate about the ethics of "hoarding" the exploits, preventing hardware and software companies from learning about the exploits and patching them to protect consumers from malicious use of the code by hackers. *Compare* Jaikumar Vijayan, *Zero-days: Why these security flaws are so dangerous and expensive*, Christian Science Monitor (Aug. 26, 2016), https://www.csmonitor.com/World/Passcode/2016/0826/Zero-days-Why-these-security-flaws-are-so-dangerous-and-expensive    [perma.cc/28ZD-GEDF], *with* Shaun Waterman, *Zero-day study: Hoarding exploits less harmful than generally thought*, CYBERSCOOP (March 9, 2017), https://cyberscoop.com/study-hoarded-

zero-days-last-seven-years-and-are-rarely-discovered/  [perma.cc/J6MS-MKD7]. At the Hearing, the Court questioned whether, now that the vulnerability is out there in some respect, it is better for consumers to know about it to protect themselves from wrongdoers.

Ultimately, the Court is not in a position to resolve this public debate in the context of an unopposed emergency motion, if at all. To be clear, while Magnet has not requested relief directly against Apple, nothing in this Order should be construed as preventing Apple from fixing the vulnerability with the information they already have. But the Court can prevent Paradigm Shift from burnishing its external profile among potential customers by taking credit for an exploit it did not develop. The Court will accord limited relief requiring Defendants to take down the Publication and cease commercially exploiting it for now.[10]

### Conclusion

Plaintiff Magnet Forensics, LLC's Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2) is **GRANTED IN PART** as outlined below. Defendants Mario Del Gaudio and Paradigm Shift Technology, and their officers, agents, servants, employees, attorneys, affiliates, successors,

---

[10] At the Hearing, Magnet acknowledged that Mr. Del Gaudio would not need to have taken any Magnet hardware or files to reproduce the exploit. For this reason, the Court is disinclined to order the forensic relief Magnet requested outside of the context of discovery. Defendants are reminded of their obligation to preserve all evidence, including electronically stored information. Fed. R. Civ. P. 37(e).

assigns, and all persons in active concert or participation with them who receive actual notice of this Order are hereby **ENJOINED AND RESTRAINED** from:

(a) Any promotion, marketing, advertising, commercial exploitation, and monetization of any product, service, tool, or capability derived from or incorporating the A12/A13 SecureROM access capability; and

(b) Directly or indirectly using, exploiting, disclosing, publishing, disseminating, distributing, or otherwise communicating or making available to any person or entity any information relating to the A12/A13 SecureROM access capability, except as provided in 18 U.S.C. § 1833. It is

**FURTHER ORDERED** that by **11:59 p.m. ET on Thursday, July 23, 2026**, Defendants **SHALL** remove the blog post titled "Introducing usbliter8: An A12/A13 SecureROM Exploit" and all associated proof-of-concept code, technical details, and derivative materials from all websites, platforms, repositories, and media on which it has been published or distributed, to the extent within Defendants' possession, custody, or control.

This preliminary injunction remains in effect throughout the pendency of this litigation unless dissolved by separate Order.

It is **FURTHER ORDERED** that Plaintiff's Motion for Authorization to Serve Process on Defendants By Alternative Means Pursuant to Fed. R. Civ. P. 4(f)

(3) and 4(h)(2) (Doc. 3) is **GRANTED**, and Plaintiff may serve process on

Defendants by the means specified in that motion.

      **SO ORDERED** this 21st day of July, 2026.

                                    _____

                                    Victoria Marie Calvert
                                    United States District Judge